IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:16-CV-60-D

| | |
|---|---|
| CHERRY TREE FARMS, LLC, and STACY LEE KING, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )      **ORDER**<br>) |
| JOSEPH WALTON RUNYAN, JR., d/b/a PLANTERS HARDWARE & BUILDING, INC., KEVIN R. EAST d/b/a OUTLAW GUNS & PAWN, and CHRIS JONES d/b/a JONES CATTLE CO., | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

On October 11, 2016, defendants moved to dismiss this action for lack of personal jurisdiction and improper venue, or, in the alternative, to transfer venue under 28 U.S.C. § 1404 [D.E. 16] and filed a memorandum in support [D.E. 17]. On October 31, 2016, plaintiffs responded in opposition [D.E. 20]. On November 17, 2016, defendants replied [D.E. 22]. On December 1, 2016, defendants moved for a protective order staying discovery pending the court's disposition of defendants' motion to dismiss [D.E. 23]. As explained below, the court denies defendants' motion to dismiss, alternative motion to transfer venue, and motion for a protective order.

I.

Cherry Tree Farms, LLC ("Cherry Tree Farms") is a limited liability company engaged in agricultural business in North Carolina, and Stacey Lee King ("King") is a North Carolina resident and the member/manager of Cherry Tree Farms. See Compl. [D.E. 7] ¶¶ 2–3. Joseph Walton Runyan, Jr., ("Runyan") resides in Ashland, Alabama and owns and operates Planters Hardware & Building, Inc., an Alabama corporation. Id. ¶ 4. Kevin R. East ("East") resides in Ashland, Alabama and owns and operates Outlaw Guns & Pawn. Id. ¶ 5. Chris Jones ("Jones") resides in Jefferson, Georgia and owns and operates Jones Cattle Company. Id. ¶ 6.

On July 27, 2012, East contacted Cherry Tree Farms and King in North Carolina about cattle for sale. Id. ¶ 9. East told King that Runyan owned cattle in Alabama and wanted to sell them. See id. ¶ 10. East also told King that the cattle were healthy, had updated vaccinations, and were ready to breed, but were a little light due to poor grass in Alabama. Id. ¶¶ 12–14.

In late July 2012, to facilitate the sale East, sent photographs of the cattle to King in North Carolina. In early August 2012, East sent emails to King in North Carolina regarding the cattle. See id. ¶¶ 16–19. Cherry Tree Farms (through King) agreed to purchase the cattle from Runyan and to wire payment of $106,355.00 to Jones. See id. ¶¶ 10, 15, 18–19. On August 14, 2012, King received an email in North Carolina from Jones informing King to wire transfer $106,355 to Jones in Georgia as payment to Runyan in Alabama for the cattle. See id. ¶ 19. On August 15, 2012, Cherry Tree Farms (through King) wired the money. See id.

On August 20, 2012, the cattle arrived in North Carolina at Cherry Tree Farms on two trucks. See id. ¶ 20. One truck contained 41 cows and the second truck contained 45 cows. See id. King observed that the cattle appeared lean and texted East in Alabama about the cattle. See id. ¶¶ 21–22. In response, East phoned King in North Carolina. See id. ¶ 23. During the conversation, King told East that the cattle appeared to be in poor health. See id. ¶ 24. East assured King that the cattle were in good health and would gain weight with a better quality pasture. See id. ¶ 25.

Between August 22, 2012, and September 19, 2012, the cattle ate well in North Carolina. See id. ¶ 26. On September 26, 2012, a cow died, and King called a local veterinarian, Dr. Dennis, to investigate the death. See id. ¶ 29. Thereafter, Dr. Dennis was on site at Cherry Tree Farms at least once a week because numerous cows were falling ill or dying. See id. ¶ 30. From November 15, 2012, to July 1, 2013, six local veterinarians studied the cows and their sudden illnesses and deaths. See id. ¶ 32.

On May 22, 2013, on the advice of the veterinarians, Cherry Tree Farms euthanized 35 of the cows. See id. ¶ 33. On June 18, 2013, again on the advice of the veterinarians, Cherry Tree Farms

euthanized another 27 of the cows. See id. ¶ 34.

King and Cherry Tree Farms had the veterinarians test the dead cows. See id. ¶ 35. The veterinarians opined that the cows arrived in North Carolina with pre-existing health problems related to prolonged exposure to parasites and inadequate nutrition over an extended period of time. See id. ¶ 36. The veterinarians opined that the health problems "would have been apparent to the original owner and brokers of the animals." Id.

On August 16, 2016, plaintiffs filed this action [D.E. 2]. Jurisdiction is based on diversity. See Compl. ¶ 7. Plaintiffs seek relief for breach of contract (count one), strict liability in tort (count two), breach of implied warranty (count three), and breach of express warranty (count four). See id. ¶¶ 39–73.

II.

Defendants move to dismiss the action and argue that this court lacks personal jurisdiction over them. See Fed. R. Civ. P. 12(b)(2). To defeat a Rule 12(b)(2) motion, a plaintiff typically must prove by a preponderance of the evidence that the court has personal jurisdiction over each defendant. See Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). When the court rules on the motion without an evidentiary hearing, the plaintiff need only establish a prima facie case. Id. When determining whether the plaintiff has met this burden, the court resolves all factual disputes and draws all reasonable inferences in the light most favorable to the plaintiff. Id.; see Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 188 (4th Cir. 2016); Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 561 (4th Cir. 2014); Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). Here, the court decides defendants' Rule 12(b)(2) motion without conducting an evidentiary hearing. Thus, plaintiffs need only present a prima facie case of personal jurisdiction. See, e.g., Perdue Foods LLC, 814 F.3d at 188.

The North Carolina long-arm statute extends personal jurisdiction over out-of-state defendants consistent with the Fourteenth Amendment's Due Process Clause. See, e.g., Dillon v.

3

Numismatic Funding Corp., 291 N.C. 674, 676, 231 S.E.2d 629, 630–31 (1977); Century Data Sys., Inc. v. McDonald, 109 N.C. App. 425, 427, 428 S.E.2d 190, 191 (1993); see Christian Sci. Bd. of Dirs. v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001); Vishay Intertechnology, Inc. v. Delta Int'l Corp., 696 F.2d 1062, 1065 (4th Cir. 1982). To determine whether the North Carolina long-arm statute reaches a particular defendant, courts analyze whether the defendant has sufficient minimum contacts with North Carolina such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation omitted); Christian Sci. Bd. of Dirs., 259 F.3d at 215; see Dillon, 291 N.C. at 676–80, 231 S.E.2d at 630–33.

Courts recognize two types of personal jurisdiction: general and specific. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011). A court may exercise general personal jurisdiction over a defendant if the defendant has "continuous and systematic contacts" with the forum state. See, e.g., Brown, 131 S. Ct. at 2853–57 (quotation omitted); Christian Sci. Bd. of Dirs., 259 F.3d at 215. Defendants' contacts with North Carolina are not continuous or systematic. See [D.E. 16-1]; [D.E. 16-2]; [D.E. 16-3]. Accordingly, this court may not exercise general personal jurisdiction over defendants. See, e.g., Brown, 131 S. Ct. at 2853–57.

When assessing specific personal jurisdiction, courts consider three factors: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the [forum] state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474–77 (1985); Perdue Foods LLC, 814 F.3d at 189. When analyzing the first two elements, courts consider only the defendant's activities. See Burger King, 471 U.S. at 472–78. In keeping with this principle, a plurality of the Supreme Court has held that "[t]he substantial connection between the defendant and the forum State necessary for a finding of

minimum contacts must come about by an action of the defendant purposefully directed toward the forum State." Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., 480 U.S. 102, 112 (1987) (plurality opinion) (quotation, citations, and emphasis omitted).

When a defendant intentionally commits harmful acts against a plaintiff and expressly aims those harmful acts at the plaintiff's state of residence, that state can exercise personal jurisdiction over the defendant. See Calder v. Jones, 465 U.S. 783, 788–90 (1984). That the defendant otherwise lacks general contacts with the forum state does not matter. Id. "Calder thus stands for the proposition that a court may exercise personal jurisdiction over a non-resident defendant who acts intentionally to cause harm to a resident's legally protected interest, knowing that such conduct will cause harm at the victim's domicile to personal or property interests located there." Musselwhite v. Int'l Learning Works, Inc., No. 2:97CV460, 1997 WL 34588522, at *3 (M.D.N.C. Oct. 17, 1997) (unpublished); see Calder, 465 U.S. at 788–90; Perdue Foods LLC, 814 F.3d at 190; Fiore v. Walden, 657 F.3d 838, 849–53 (9th Cir. 2011); cf. ESAB Grp., Inc. v. Centricut Inc., 126 F.3d 617, 625–26 (4th Cir. 1997).

Plaintiffs argue that this court has personal jurisdiction over defendants because N.C. Gen. Stat. §§ 1-75.4(4)(a),[1] 5(c),[2] and 5(e)[3] and due process all support personal jurisdiction. Essentially,

---

[1] Section 1-75.4(4)(a) provides personal jurisdiction in any action "claiming injury to person or property within this State arising out of an act or omission outside this State by the defendant, provided that at or about the time of injury . . . [s]olicitation or service activities were carried on within this State by or on behalf of the defendant." N.C. Gen. Stat. § 1-74.4(4)(a).

[2] Section 1-75.4(5)(c) provides personal jurisdiction in any action that "[a]rises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to deliver or receive within this State . . . goods, documents of title, or other things of value." N.C. Gen. Stat. § 1-74.4(5)(c).

[3] Section 1-75.4(5)(e) provides personal jurisdiction in any action that "[r]elates to goods, documents of title, or other things of value actually received by the plaintiff in this State from the defendant through a carrier without regard to where delivery to the carrier occurred." N.C. Gen. Stat. § 1-74.4(5)(e).

5

plaintiffs contend that defendants East, on behalf of himself, Jones, and Runyan contacted plaintiffs in North Carolina by telephone or email to sell the cows to plaintiffs. The negotiations involved multiple calls and emails to North Carolina and culminated in plaintiffs buying cows shipped from Alabama into North Carolina, and plaintiffs sending money to Georgia to be divided among defendants in either Georgia or Alabama. Thereafter, plaintiffs were injured as a result of defendants' alleged breach of contract, breach of implied warranty, and breach of express warranty, and as a result of the cow's illness for which plaintiffs contend defendants may be held strictly liable.

The record demonstrates that each defendant knew each was directing specific commercial activities concerning the sale of the cows toward North Carolina. See [D.E. 16-1]; [D.E. 16-2]; [D.E. 16-3]; [D.E. 20-1]. On this record, defendants purposefully availed themselves of the privilege of conducting activities in North Carolina, and plaintiffs' claims arise out of those activities directed at plaintiffs in North Carolina. Moreover, exercising personal jurisdiction over the defendants is fair and constitutionally reasonable. See Asahi Metal Indus. Co., 480 U.S. at 112–13; Burger King Corp., 471 U.S. at 475–78; Calder, 465 U.S. at 789–91; Universal Leather, LLC, 773 F.3d at 561. Thus, the court denies defendants' motion to dismiss.

III.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought...." 28 U.S.C. § 1404(a). In analyzing a motion to transfer, the court initially determines whether the action could have been brought in the proposed transferee district. See, e.g., Szulik v. TAG V.I., Inc., 858 F. Supp. 2d 532, 547 (E.D.N.C. 2012) (collecting cases). If so, the court must then decide whether to transfer venue. Id.

To determine whether an action could have been brought in the transferee forum, a court must find that personal jurisdiction and venue would have been proper in the proposed transferee district had the plaintiffs filed there. See, e.g., Hoffman v. Blaski, 363 U.S. 335, 340–44 (1960).

6

Personal jurisdiction over defendants would have been proper in the Northern District of Alabama based on defendants' contacts with that district. Venue also would have been proper in the Northern District of Alabama because a substantial part of the events and omissions giving rise to plaintiffs' claims arose in that district. See Compl. ¶¶ 9–38; 28 U.S.C. § 1391(b)(2). Therefore, personal jurisdiction and venue would have been proper in the Northern District of Alabama had plaintiffs originally filed the action there.

Next, the court must decide whether to transfer venue. See Szulik, 858 F. Supp. 2d at 548; Dacar v. Saybolt LP, No. 7:10-CV-12-F, 2011 WL 223877, at *2 (E.D.N.C. Jan. 24, 2011) (unpublished); Blue Mako, Inc. v. Minidis, 472 F. Supp. 2d 690, 703 (M.D.N.C. 2007). A district court must "consider four factors when deciding whether to transfer venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir. 2015).[4] In balancing these factors, a district court has substantial discretion to decide whether to transfer venue. See Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Brock v. Entre Comput. Ctrs., Inc., 933 F.2d 1253, 1257 (4th Cir. 1991); Jenkins v. Albuquerque Lonestar Freightliner, LLC, 464 F. Supp. 2d 491, 493 (E.D.N.C. 2006). The court now considers each factor in turn.

As for the first factor, the weight accorded to plaintiffs' initial choice of forum, plaintiffs initially filed this action in the Eastern District of North Carolina. Thus, the first factor weighs against transfer.

The second factor concerns accessibility of evidence and witnesses. Although there will be some evidence concerning the transaction in Alabama and Georgia, there will be at least the same,

---

[4] Courts in this district have described the test in terms of eleven more-specific factors rather than four more-general factors, but the analysis remains essentially the same. See Szulik, 858 F. Supp. 2d at 548; Dacar, 2011 WL 223877, at *3; Charles v. Bradley, No. 5:08-CV-124-F, 2009 WL 1076771, at *2 (E.D.N.C. Apr. 21, 2009) (unpublished).

7

if not more, evidence concerning the transaction in North Carolina. Moreover, the six local veterinarians that treated the cows and analyzed their health in North Carolina will provide substantial and important evidence. Thus, the second factor weighs against transfer.

The third factor concerns the convenience of the parties. Plaintiffs reside in the Eastern District of North Carolina. See Compl. ¶¶ 2–3. Defendants Runyan and East reside in the Northern District of Alabama. See id. ¶¶ 4–5. Defendant Jones resides in the Northern District of Georgia. See id. ¶ 6. On balance, the third factor is neutral.

The fourth factor requires the court to consider the interests of justice. The interests of justice implicate the relative congestion of the transferee and transferor courts, the particular interest a forum may have in deciding a case, and the preference for judicial efficiency and consistency. The Northern District of Alabama is less congested than the Eastern District of North Carolina. As of June 30, 2016, the Eastern District of North Carolina had 759 pending cases per judge, whereas the Northern District of Alabama had 376 pending cases per judge. See United States Courts, Federal Court Management Statistics, http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2016. However, the median time between the filing of a civil action and its disposition is 10.2 months in the Northern District of Alabama, compared to 9.2 months in the Eastern District of North Carolina. Id. Therefore, the relative congestion of the two forum courts slightly favors transfer.

As for the local interest in this case, the local interest is much greater in the Eastern District of North Carolina. Plaintiffs' case has a local character in that it concerns cattle that, although raised outside North Carolina, were sold to plaintiffs, delivered to North Carolina, and treated in North Carolina before ultimately dying in North Carolina. Therefore, the preference for having a local court resolve a local dispute weighs against transfer.

Viewed as a whole, the only factor slightly weighing in favor of transfer is the relative congestion of this court compared to the Northern District of Alabama. This factor does not

8

overcome the "substantial weight" generally afforded a plaintiff's choice of venue or the other factors. See, e.g., Trustees of the Plumbers and Pipefitters Nat'l Pension Fund, 791 F.3d at 444. Accordingly, having considered the entire record, the court denies defendants' motion to transfer the action to the Northern District of Alabama.

IV.

In sum, defendants' motion to dismiss or in the alternative to transfer the action to the United States District Court for the Northern District of Alabama [D.E. 16] is DENIED. Defendants' motion for a protective order [D.E. 23] is DENIED as moot.

SO ORDERED. This 21 day of December 2016.

JAMES C. DEVER III
Chief United States District Judge